3-11-09-04, City of East Peoria, my name is Catherine Swice, I represent the City of East Peoria, who is the appellant in this matter. The defendant, Mr. Palmer, was stopped by East Peoria police officer Jason Ernst based on a call the officer had received from security at Paradise Casino in East Peoria reporting an intoxicated patron who had been cut off at the casino and was getting ready to drive away. The defendant was subsequently arrested and charged with driving under the influence of alcohol pursuant to section 11-501A of the vehicle code. The defendant filed a motion to quash his arrest and suppress the evidence there from grounds that the officer lacked reasonable suspicion to stop his vehicle and that he lacked probable cause to arrest. The primary issue the City would like to address today is whether Officer Ernst had reasonable suspicion to stop the defendant's vehicle based on a reliable detailed tip from security officers at the Paradise Casino reporting that the defendant was intoxicated and getting ready to drive off the property. Applicable standard in this case is reasonable suspicion for a traffic stop which provides that an officer may stop a vehicle to investigate possible criminal behavior where the officer can point to specific articulable facts which, when taken from the reasonable inferences there from, reasonably warrant such an intrusion. An officer may make a traffic stop based solely on information provided by a third party so long as the tip is reliable and allows a reasonable inference of criminal activity. The call in this case came from a uniquely reliable source. In fact, it would be difficult to conceive of a source more reliable than the source of information in this case. Furthermore, the tip was sufficiently detailed to allow the officer to infer that the suspect that he stopped was engaged in criminal activity, in this case driving under the influence of alcohol, and it was also sufficiently detailed to allow the officer to locate the vehicle that was the subject of the tip. Now this case comes down to common sense and basic reasonableness on the part of the officer. The caller in this case was not anonymous. In fact, he was a security officer from the Paradise Casino in East Peoria. He identified himself by name and location to the dispatcher when he called the police and this is the Paradise Casino. What do you do about the implicit credibility findings by the trial court? The trial court evidently didn't believe the officer. Well, the officer's credibility does not affect this. The trial court's finding regarding the officer's credibility doesn't affect this because the other evidence in the case supports the reliability of the tip. The call from the dispatcher to the officer was entered into evidence and so the details as to what the officer knew are in the record separate from his testimony. Furthermore, the Paradise security officers testified at the hearing as to what they observed and what they told the police. So there is no question in the record of what information was available to the police and that that information was sufficient for the officer to make a stop. What about the issue of hearsay? Because the person, the dispatcher, called the police, or called the police dispatcher, but maybe I've got the wrong name for the one from the casino. The person from the casino who called the police was not the one who saw the incident inside or them getting in the car outside. That was another person who then told him and then he told the dispatcher and then the dispatcher told the police. Is that some kind of a double or triple hearsay issue? No, it's not under these facts. The fact that the security officer, in fact it was the security supervisor, that made the call is not the security officer that performed the cutoff. It's immaterial under these facts because the issue is whether the information given to the police is reliable. Well first the police officer decided to pursue the dark colored SUV before there was even a follow-up dispatch that they left the parking lot, right? That is correct. So they pursue it before they get the follow-up call, right? Well the officer is aware that the dispatcher is on the phone with security and that it is being relayed to him. He positions himself at the entrance to the Paradise parking lot. He has the description of the vehicle and he observes it leave the parking lot. So at that point... A dark colored SUV. Right. A dark colored Ford SUV is the information he's given. He sees a vehicle matching that description leaving the Paradise parking lot. It is reasonable for him to follow that vehicle and not wait and watch it drive away while he's sitting and waiting for the call to be relayed from Paradise to the dispatcher to the officer. He's aware that there's going to be a lag in the dispatch there. He saw a car that matches the description he was given and he pulled out and followed it. I'm sorry, where did he get that description then? The dispatcher had given him that description initially. And where did the dispatcher get that information? From the security supervisor at the Paradise. And where did he get that information? From the officer that encountered the defendant and asked him to leave the casino. But in this case... One person, second person, third person? Correct. Well the information given to the dispatcher is imputed to the officer. It's not a hearsay connection hearing it from the dispatcher. Second, this is not hearsay because this is not something that's being used to show the truth. This is something that is used to show the safety of this investigation. And ultimately the issue is whether the information was reliable and whether it was reasonable for the officer to rely on this information. The police officer, as far as he's concerned, Paradise Security has reported that someone has been cut off on the boat. As far as his reasonable inferences go, Paradise Security cut this person off, escorted this person out, and Paradise Security called the police. It doesn't make a difference to him. When did he learn about what kind of SUV it was? In the initial call from dispatch. He had that information at the time. How detailed was that about the vehicle? He was given that it was a dark Ford SUV and he was given a license plate number. So at the point he has this information, he knows that it's a call from the Paradise Casino. He knows what the Paradise Casino is. He knows what they do. He knows what goes on there. And the security officers were both available to testify at the hearing. They testified that they are trained and their training involves enforcing the state regulations on the boat and that they have a protocol to follow. When a patron is seen to be too intoxicated to remain in the casino. And then that protocol involves asking that patron to leave and informing that patron that the police will be called if they decide to drive away. Officer Ernst knows this. This is common knowledge to not only Officer Ernst, but any law enforcement officer in Tazewell County. Officer Ernst testified that he understands that when someone is cut off on the boat, it means they were refused further alcohol service and asked to leave the casino. He knows this because he's familiar with the location. He knows what goes on there. He knows what their procedure is. So when he hears this information, he has no reason not to rely on this information. It is entirely reasonable for him to do so. And in fact, based on the nature of this source, when Officer Ernst hears that Paradise Security has called and reported a patron is intoxicated, has been cut off on the boat, and is driving away from the casino in a dark Ford SUV with a specific license plate number, he has no reason to doubt that information and every reason to stop that vehicle and investigate the possibility that it is driving under the influence. Because ultimately what the issue is here and what Officer Ernst was investigating is the possibility that there's a drunk driver on the streets in East Peoria. Public safety interests require it. An officer has this reliable and credible information reporting that a person is driving under the influence. He must be permitted to stop to investigate this tip. The danger that a drunk driver poses to others on the road... Did the first call even say the person had left the parking lot yet? It had not. So he just follows an SUV that leaves the parking lot? He follows a dark SUV that manages the situation. Before he's told that it left the parking lot? Yes, because he personally observed it and rather than watch it drive away, he chose to follow it. He sees an SUV leaving? Yes. Before he's told that the people who were drunk left the parking lot? Yes, based on his observations in locating a vehicle that not only matched the description but was leaving the Paradise parking lot. And given the information he had, and given that it was from a reliable source and it was credible information, the risk of allowing that car to simply drive away is too great to require him to simply follow it and wait and see if it will make a traffic stop. This is a principle that was recognized by the 4th District in its cases of People v. Schaefer and People v. Ewing, where the court indicated that a DUI presents a danger to the public that is difficult to thwart by means other than a Terry stop, because that driver remains impaired and remains a danger as long as he continues to drive. The standard for reasonable suspicion is whether the facts known to the officer reasonably warrant the intrusion of a traffic stop. Here, we have a risk involved in allowing a suspected drunk driver to continue to drive when the officer already has reliable information is simply an unreasonable risk to require the officer to take in comparison with the minimal intrusion that is a traffic stop of the defendant. Well, the principle you want to establish is that if they just get a call, hey, somebody's left us and they were drunk, and you see a car going off, that's good enough? Yes, under these circumstances, given the source and given that the Paradise gave a specific description of the vehicle. And who's reliable? Of the three people involved, the dispatcher, the security person, the boss, the other security person, are all three really super reliable, or is it just the dispatcher? Quite frankly, the officer has no choice but to rely on the dispatcher, who has been chosen to relay this information to the officer. The officer is not going to get the calls personally from the Paradise security. And second, for the reasons stated, he has no reason to doubt the information received from the Paradise. This is not an unfamiliar call for the police to get. It is not uncommon for them to get these types of calls from the Paradise. And given what the officer knows about the source and knows about their operations, it's not unreasonable for him to rely on that at all. What part did he rely on, would you say, in this case? Only in the first call? Well, the information that he was received. The Paradise security called police to report an intoxicated patron that had been cut off on the boat and was getting ready to drive away from the property in a dark Corvette. In the first call, you don't know that the person is driving away from the parking lot, right? Right. So he follows the person who's driving away from the parking lot. I mean, don't we have to rely on the first information he received? Because he immediately followed somebody then. Yes, he is relying on the information he received. The other calls later on really don't matter for this analysis, do they? Not for the initial stop analysis, no. So what was reasonable has to be based on that dispatcher's statement where the person wasn't driving away yet, but he had a person drunk leaving the casino. Well, he has the information that the person is drunk and is going to be leaving the casino in this vehicle. He's been informed that they're getting ready to leave. So when he sees a car matching that description, leaving, it's reasonable for him to infer that this is the suspect. And especially since this is an investigation. He's seen an SUV leave. Yes, a dark Ford SUV. So it matched the description. And so what he's doing here is simply stopping to investigate the information he had. This is not, at this point, arresting the defendant. This is certainly not trying the defendant. This is him stopping to investigate information that he has from the Paradise, that there is a drunk driver on the road. You also get two minutes. Thank you. In addition to the reliability of the tip, the information given to the officer did meet the four factors for determining the reliability of the tip that the 4th District set out in Schaefer v. Ewing. And unless the court has any questions on those, I'm not going to go over those four tips. With regard to the authority to bring these suits, it was like two or three state attorneys back, right? Two. Two state attorneys back. The statute says no state attorney. Right. There's nothing in the statute that requires that affirmatively states one way or the other about getting subsequent state attorneys or no mention of subsequent state attorneys. Correct. The statute does not indicate that once obtained, this authorization would ever expire, and it does not state that it's the current state's attorney, and the statute is silent as to whether it has to be renewed when a subsequent state's attorney takes office. The city's position on this is that the city obtained the proper authorization from the state's attorney's office in 1989, and that written authorization has never expired, terminated, or otherwise been revoked. Well, we can finish this answer. So when can it be terminated under your view? The current state's attorney, the sitting state's attorney, has, I would say, the authority to revoke it at any time. But that's not the statute either. Right, but it would be reasonable to say it's not in perpetuity, that the existing state's attorney could revoke it. He has not done so. And, in fact, he has reaffirmed that the city has continuously had it. Subsequent to this case. Yeah. Correct. Thank you. After this came up. Yes. Thank you. All right. Thank you, Ms. Swyatt. And Mr. Dubé? Yes, Your Honor. Please report, counsel. Thank you. There are actually three issues before the court today. The three issues are what was just discussed at the end, the jurisdiction of the city of East Peoria to even bring this case. The second issue is was there reasonable suspicion? I think that's the primary issue at heart. And was there probable cause, which the court really never addressed because she never got that part because of the motion to. Well, why should we discuss probable cause? I'm really not going to discuss it much. It was brought up in a brief momentarily. I don't think it ever gets there because, as the court's been addressing so far, the reasonable suspicion was never met. But, I mean, what are we to review on probable cause? There was no decision made on probable cause. There wasn't. It was just brought up in the brief, so I just wanted to touch upon that. From a review standpoint, we're not reviewing it. I would agree. Just the two issues then at this point. As far as the issue of under Rule 604, Justice Carter, I think you were correct in the fact that the statute is very clear. It says the state's attorney, which would mean under a plain and unambiguous reading of the language, it's the current state's attorney. It doesn't say the current state's attorney. It says the state's attorney, which would mean the state's attorney. It doesn't mean a state's attorney, which the state's attorney when they had authorization was from 1989. They never renewed that. Was that person not a state's attorney then? He was the state's attorney at that time. That's who wrote the letter and signed the letter was the state's attorney. So the statute doesn't say that you have to renew it.  However, it says the state's attorney. I think it's very revealing that in this case, after the appeal was filed, that the city of East Prairie then went and got a new letter from the state's attorney at this point in time to say that if there was something, they'd correct it. That's better safe than sorry, right? I guess so, but it doesn't go back to when this event took place. There's never been a decision on this all these years. I'm sorry? There's never been a decision on the statute. There hasn't. We've looked it up, Judge, and there hasn't been. There probably needs to be in this situation. And we appreciate you raising the issue for us. Correct. So that's pretty much the argument in this. The language is plain and ambiguous. It does say the state's attorney, and in this case, they did not have it from the current state's attorney until May of 2012, which is well beyond this point in time. How would you apply the statute on statutes indicating that you'd give liberal interpretation of the statutes? Well, I think liberal interpretation of the statute would still mean when it says the, you can't be too much more liberal when it says the. If it said a, that would be a liberal interpretation. Well, let me tell you about a point of power, actually,  under those kinds of guidelines. Well, again, though, I don't think you can liberalize the word the that much. It's because language is the language. A is more liberal. The is specific language, as the Court's well aware, so the legislature was specific. They could have just said a state's attorney and just let it run continually until it was revoked. They said the state's attorney, so I think to liberalize the word the would be the wrong meaning based upon plain and unambiguous language, Your Honor. I'm just thankful we don't have to consider the as it was written in 1791. Correct. I would agree with that. And that's why we enjoy the challenge that you've raised. You know, getting into the part of reasonable suspicion, and I think the Court has hit it right on the head. In this situation here, I think that the city, their reading of the facts in this case are somewhat misleading because we had two hearings in this matter. It was first the motion to suppress summary suspension in March. That hearing took place over three hours. Judge Wilson heard that one. Then in the motion to quash, that was over a five-hour hearing, and in both cases, Judge Wilson took almost two weeks to make her decision in both cases and wrote out a very well-articulate made decision in both cases. We were granted a motion to suppress, and actually I did both of those hearings, and in the motion to quash, I read from my questions from the transcript, so I know the questions were exact to what took place in the motion to suppress. And in that situation, it's important to note here that this tip did come from an officer who observed the defendant for less than three minutes and saw him drink a sip of beer, but the tip came in. Here's the important part of this. The tip that came in and that the officer stated in his questioning was that his tip was two people were leaving the casino, but the female had been cut off. There was never a mention of the defendant, Mr. Palmer, drinking at all, and that came out, and Officer Ernst testified to that fact, that his tip was the female had been cut off, not that a patron was leaving and driving intoxicated. So it's very important here to what he knew at the time, and that's what he knew. As of course pointed out, that the dispatch was on the phone with security, and security was saying, we will call you, we will let you know when he's leaving, and dispatch relayed that to Officer Ernst. So he's sitting there waiting for a vehicle, but he not only knew the description by color, he had the registration number. But instead of waiting for that call from dispatch, on a hunch, he sees a vehicle that might match the description go by, so he pulls out and makes the traffic stop. There was a lot of testimony, if you read the transcripts, in this case regarding was there a traffic violation. And first, the officer wrote him a ticket for disobeying a traffic control device. Well, what came out of that was, in the first motion to rescind summary suspension, Officer Ernst said, well, yeah, I went back and watched the video, and I wrote him the wrong ticket. I should have wrote him a ticket for obstructing traffic. So he mailed him a ticket later, and then they dismissed the ticket for disobeying a traffic control device. So when you talk about credibility of the officer, this is where Judge Wilson, through eight hours of testimony, found this officer to be not credible, because each time he would say something, under direct examination in this case, because... Well, how was that articulated? He didn't specifically... What did he say about the credibility of the officer? Because in the motion to quash, he was trying to change his answers from the motion to rescind. I know what happened. How did the judge articulate his credibility finding? In her finding? In her finding, she just simply said that she found him not to be credible. She didn't articulate that, but these are the reasons why she would have found him not to be credible, because he was going back, and I think she made reference to that, that going back and looking at the transcript from March 23rd, motion to rescind, he was trying to add things. And under direct examination, I asked him, are you adding these things now because you went back and reviewed things? Yeah. So your answers have changed. And I was very specific when I started the motion to quash. I asked him, I said, do you remember testifying on March 23rd? Yes, I do. Did you tell the court then in your answers everything you knew at the time you made the stop? Yes. Were you truthful? Yes. So you've had all the information from then. So anything he added afterwards is why the judge found him not to be credible, and can start to change his answers. So if you're looking at this reliable tip thing, the reliable tip, it's coming from an officer who didn't really observe anything, and he even talked about less than three minutes, and then Mr. Palmer was cooperative, and the complaint that actually went to the officer was not that a patron was leaving, it's that two people were leaving the casino, one of them, the female, had been cut off. There was never any mention. And even after the stop took place, the officer mentioned, yeah, I didn't have any information that Mr. Palmer had been drinking at all. And more importantly, he tried to say that he observed a traffic violation, but when pressed on the traffic stop itself, and this is in Judge Wilson's ruling, he admitted he didn't observe a traffic violation at all. So there was no violation. The city is now trying to say, well, we don't need a traffic violation, just a reliable tip. Well, that's contrary to other cases, that you actually have to have something to corroborate that. Either you observed the bad driving, there was never any complaint of any bad driving. There was nothing. So the officer is now just saying, I can stop somebody because I have a hunch that this vehicle may match a vehicle that I'm actually waiting for, that I have actual information on, and it's not reliable. The tip isn't reliable because it's coming from an officer to a supervisor to the dispatch. And there's never been a case like that where you have that many parties. In other cases, it's been this person observed something and then relays that to the officer. Now, the four criteria that have to be met here in this case just aren't met. In this situation, you know who the informant is. That's clear. But Mr. Stevens was actually the security officer that made the initial observation and then relayed that information to Mr. Ternetti, who was the supervisor there. And if you look at the first two factors, whether the informant identified himself, sure, you've got the identification. Whether the person would sign a complaint, I don't know. They probably would. They're with the casino. But whether they actually witnessed, that's the third prong. And that didn't happen. He didn't witness anything. The other thing is whether the information provided was individually corroborated. Well, it wasn't. The officer didn't observe anything. He admitted when he went by, he couldn't see anything. He didn't know who was driving. He couldn't even tell if it was the right vehicle. He just went out on a hunch and pulled out instead of having the casino say, hey, they're now leaving the casino. Follow them. He didn't have any of that in this case. So it's very clear that there is no reliability of this information. And the judge, if you look at her ruling, and as the court's well aware, the court will give great deference to the trier of the fact in a motion to quash because that's the person who has heard the facts. And it's not going to be overruled unless there's clearly, clearly something that she missed. In this case, Judge Wilson was there. She watched the officer testify. She looked at the video. We went through that video step by step by step. And each time the officer tried to say he observed something, the video would play, he's talking about illegal lane usage. I said, do you see any lanes there? Well, no. Wouldn't it be difficult then for you to write somebody or for somebody to violate illegal lane usage when there's no lanes? Yeah, I guess it would be. So each time the officer would testify about what he observed trying to say he had a violation here, it was discounted. And the judge is watching this. And not only did he do it in the first hearing, he tried to re-up it in the second hearing and do it again. And that's where Judge Wilson again found him not to be credible because he's trying to change his testimony when it was already locked in. So great deference must be given to what Judge Wilson witnessed and what his testimony was. And in this case, Your Honor, I think it's very clear. If you just look at the transcript, if you look at Judge Wilson's ruling, there was no information ever. There's nothing that says Mr. Palmer was ever intoxicated or drinking. There's never been an officer admitted to that. The only thing was, and it's very important here, the tip that the officer knew, this is what he testified, that what he knew at the time the call came in is that the female patron had been cut off. That's absolutely important because that's what he knew. He played a hunch after that, and that's what Judge Wilson talks about, a mere hunch. And you must look at the fact that the officer finally admitted that he observed no traffic violation. There was never a traffic violation that he could find when he was put up to the video about what he saw. So taking all that into consideration, there was no reasonable suspicion for the stop. It just doesn't happen here, and Judge Wilson was very articulate in that. This was not just a decision she made from the bench and said, I don't find it. She went back and researched, she read transcripts, she watched the video again. So great difference must be given to her ruling in this case, and we believe that their motion should be denied. Any questions? Thank you, Mr. Kovacs. And Ms. Weiss? It is immaterial in this case whether the person cut off on the boat was female or male. First of all, it's immaterial, and second, it's a misstatement of the evidence. It is immaterial because the tip was reliable and reported a possible DUI, giving a description of the vehicle, and the officer stopped the vehicle to determine whether the driver was intoxicated. And as the officer testified, a possible DUI means the driver's intoxicated. It doesn't mean the passenger. So he has every reasonable inference that whoever's driving that car, be that a male or female, he needs to stop and investigate that tip. Second of all, it is a misstatement of the evidence to say that Officer Ernst only had information that a female had been cut off. In fact, the evidence is clear that Ernst was not told that the suspect was female. The 911 call reported a drunk couple that was getting ready to leave the boat, and dispatch told the officer, we have a possible DUI, subject was cut off on the boat. And the testimony shows it was only after the officer made the stop, in fact, after he arrested the defendant, that he went back to the Paradise and found out at that time that the female had been cut off first, but that the defendant had also been cut off. So to say that it's relevant that a female had been cut off, it's not relevant, and it's in fact a misstatement of fact. As far as the officer's credibility, his testimony at the motion of quash is supported by the tapes of radio dispatch and the testimony of security officers. It's, again, disingenuous to say that his answers changed only after reviewing the video. What he testified to, what he remembered at the time of the summary suspension hearing is not relevant. What is relevant is what information he had at the time of the stop. If he later didn't remember that, that's irrelevant. The dispatch tapes were entered into evidence. The security officers testified to what they told police that night. And that information clearly establishes that he was told there's a possible DUI leaving the Paradise. And as far as the traffic violations that he observed, his testimony never wavered on that. In the transcript, it remains clear that he observed the defendant driving in two lanes of traffic, that the lines may be faded, but they were there, as well as directional arrows to mark the lane. And he never wavers from his assertion that he observed a traffic violation. But the audio recording was a hidden evidence. The audio recording of the dispatch traffic, the radio traffic between the officer and the dispatcher was admitted. The 911 call was not admitted, as the trial court found it was hearsay. Now, the city believes that was also error, and that is addressed in the city's brief, because it is clearly not hearsay, but rather information to show the steps in a police investigation, particularly in this police investigation, where what the officer knows is really what's at issue, and the tape is the best evidence of what the officer knows. But the period of time we're talking about for the audio recording that's not admitted of the 911 call, what was the time frame for that? The time frame of the call? That was the call from Security Supervisor 2911, and according to the testimony of the security officers, that was made immediately upon the defendant being escorted off the premises. And finally, again, it's irrelevant that the security supervisor is the one that called the police, and not the officer that performed the cutoff, again, because the police officer didn't know this fact and didn't need to know this fact, because he could infer that security performed the cutoff and security called the police. And nothing in the analysis of Ewing or Schaefer indicates that had the callers in those cases reported the incident to their supervisor, they were both calling from businesses, had they reported the incident to their supervisor and the supervisor had called police, that anything in the analysis of those cases would change, because ultimately what is at issue is whether the information received by the officer is reliable. And in this case, it was reliable. And unless the court has further questions, I have nothing further to say. I guess not. Thank you very much, Ms. Wise, and thank you both for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short time.